This is a case of the People v. Watson 124-1495. Before us we have Justice Cynthia Cobb, Justice Raymond Mitchell, and Justice James Fitzgerald Smith. Our procedure basically is we give you the approximate 15 minutes. We do not interrupt you unless you go off on a tangent. And then we have the appellee follow and do the same. And at the end then the appellant gets to do his closing. With that we're ready to roll. And who do I have here? Good afternoon, Your Honors. Counsel, may it please the Court. My name is Brian Reina with the Office of the State Appellate Defender. I'm representing the appellant Kevin Watson. Assistant State's Attorney Noah Montague on behalf of the state. All right. O'Byron, you may proceed. Thank you, Your Honor. Your Honors, this is a case where the trial court erroneously granted the state's petition to sentence Kevin Watson as an adult and subsequently imposed an excessive 25-year prison sentence. Kevin has been incarcerated since 2009 when he was 15 years old. Since then, he has proven to be a rare and inspiring example of ambition and reform. While incarcerated in maximum security prisons as a juvenile, he earned his high school diploma, successfully completed a plethora of courses involving practical life skills, behavioral skills, and employment skills. He completed a paralegal training program and was even trained to lead addiction recovery groups. He worked in positions requiring trustworthiness and received exemplary evaluations based on his work ethic, dependability, and ability to de-escalate conflict. Two correctional officers even endorsed his character and rehabilitation at the hearing below. In finding that adult sentencing was warranted, the trial court expressed confusion about how to consider the applicable factors, underemphasized Kevin's rehabilitation, overemphasized his age and the nature of the offense, and failed to show consideration of discharge as a possibility of relief. Specifically, the court found that Watson's age and the fact that there was a murder was the strongest factor favoring adult sentencing. However, he was only 15 at the time of the offense, and murder alone is not enough to warrant adult sentencing or else we would not need a transfer hearing. The court also declined to consider the extensive evidence of rehabilitation presented at the hearing, including testimony from Officer Ebinger and Major Kaylin Bridges, even though this case presents a unique opportunity to make a decision with the benefit of hindsight, and Kevin's work on himself over almost two decades now should have been considered in determining whether adult sentencing was appropriate. On appeal, the state concedes that two of the applicable factors, Kevin's age and the availability of juvenile facilities for his rehabilitation, weighed against adult sentencing. Additionally, three other factors weighed against adult sentencing. There was no evidence the offense was committed in a premeditated manner. The state identified no evidence of advanced planning. Additionally, the state concedes that Kevin's history consisted only of juvenile adjudications that themselves were not for adult sentencing. And finally, the security of the public was significantly mitigated by the, again, the extensive rehabilitative work Kevin has done over the past 17 or so years. In determining that adult sentencing was warranted, the court said that the two choices before it were either adult sentencing or to sentence Kevin as a juvenile, but the court said that option wasn't available to it. The court didn't mention that under this court's order, if the factors weighed in favor of juvenile sentencing, the results should have been discharged. And where the evidence presented below did weigh against adult sentencing, the court should have discharged Kevin. If this court declines to reverse the trial court's ruling regarding adult sentencing, Kevin additionally asks to reduce his 25-year sentence to 20 years, which is the statutory minimum. In imposing a 25-year sentence, the court disregarded the extensive rehabilitation again that occurred between 2022 and the sentencing hearing in 2024, determining that he had already considered this type of evidence. However, the additional years of mitigation should have been significant and resulted in a reduction of Kevin's sentence to the statutory minimum. For those reasons, Your Honor, we would ask that this court reverse the trial court's finding that adult sentencing was warranted and remand his case to the trial court with instructions to discharge Kevin. Alternatively, we would ask this court to reduce Kevin's sentence from 25 years to 20 years. Questions? I just have maybe one. You take the position then that the rehabilitation that was recognized by the court during the buffer remand should also then have been considered by the court on the second sentence. Is that correct? Yes, the parties incorporated the prior evidence at the 2022 sentencing hearing into the 2024 sentencing hearing. And the fact from the transcripts, it appears the judge only considered the 2022 mitigation that was presented. While there is testimony from two officers at the 2024 hearing, as well as extensive other rehabilitation evidence, the court determined it had already considered this. And it actually hadn't. While the rehabilitative evidence prior to 2024 favored it. Yes, excuse me, I'm sorry. So this is a fairly unique situation where we have a defendant who really has been, the case has been remanded more than once. Well, I'll see you, Your Honor. The court to take a look at sentencing. So by the time that we even get to. Yes, Your Honor, I'm sorry. There's two of two of you speaking at the same time. I just, I couldn't hear. Maybe we'll wait. Yeah. I apologize. All right. That's all right. That's all right. So the majority of the rehabilitation to happen during the time that this was an adult or juvenile. Yeah, I don't know if I have to have a number or something, but I'm sorry, I can't repeat that. But I don't have a number. Justice Smith, we're having some trouble hearing because we're hearing you and me at the same time. I'm sorry, it just comes on right as you're asking the question. No, sorry. You get a kick out of this. I come home and the doors, our electricity had gone out and so I couldn't get in. So I had to finally found a neighbor that had a key to let me in. I managed to get in without it. And now she was just calling to hear the key. Sorry. No problem. I'm glad you made it. That's a stressful situation. That's okay. Welcome back. So I was attempting to just have some conversation with you, counsel, about the timing of much of the rehabilitation conduct with this defendant. Did much of the rehabilitation occur post or after the time he had reached the age of majority? Kevin is an exceptional person and inmate. He has been rehabilitating himself from the second he was arrested. I don't think we can say more or less occurred before the age of majority. He's been so consistent with his work on himself and improving himself that there was a ton of sentencing hearing from even as far back as trial. He had attorneys testifying on his behalf, members of the community, members of outreach programs, ex-teachers of his. He's somebody who's been working on himself since before any of these offenses. He rose from difficult childhood circumstances and upbringing with absent drug-addicted parents, has had no support at all, and has done something that personally I haven't seen any defendant prisoner do in an Illinois prison. The amount of courses he's completed, he's helped other inmates, he's to reduce conflict and help other people. He's even taken the money he's earned from cleaning toilets and donated it to cancer research, or excuse me, a cancer foundation. It's really remarkable. But I can't say if it more or less occurred before or after. He's done so much that there was a lot before and there's a lot after. And he's, you know, regardless of the outcome, is somebody that will continue to do that. He's, in fact, continued to do this rehabilitation knowing that he can't get any sentence credit for good behavior. And that hasn't stopped him. He's not doing it for that. He's someone that truly believes in becoming a better person and one day contributing substantially to society. Well, this case, actually, I don't think anybody would disagree. Even the trial court judge had some commentary about the nature of this case, it being the fact that this individual was now an adult. He was being asked to apply these factors that would, in the usual course, be anticipated to be applied to a juvenile. But in this case, we're applying them to someone who is nearly 30 years of age. So, to accept your argument and looking at the rehabilitation would require us to just look forward, not just look at the time and when this individual was, in fact, a juvenile, which is when I think the legislature probably intended that these factors would be applied. Well, Your Honor, I mean, this is an unusual circumstance and it's understandable that the court, I think, expressed some confusion as to how to consider this rehabilitation. In Clark, the court said that to determine whether these factors apply, which is a case that also involved the retroactive application of this amendment, that we need to look at the defendant's history and characteristics. And those, you know, well, perhaps when the statute first passed, the idea would be that this happened as a juvenile. But the fact is this sentencing is happening, this hearing happened when it did, and we're not required to ignore relevant evidence. I mean, the state hasn't cited any authority to say that this shouldn't be considered. And, you know, all of this mitigating evidence of rehabilitation is relevant to the ultimate determination of whether Kevin would have been amenable to rehabilitation in a juvenile facility. Obviously, having done this with no support, being surrounded by older, you know, more powerful, stronger people with no services directed specifically at juveniles is remarkable and shows that he would have been rehabilitated in a juvenile facility and discharged when he turned 21. And considering this now, you know, this only works in his favor because of his excellent behavior, but this is helpful to reach a more reliable result about the application of these factors. And if he had not been so remarkable, this would work against him. And that would be fair, I think, too. You know, we could say then if he were violent and aggressive in prison and couldn't comply with orders, we'd be able to look at that too and say, hey, there were juvenile facilities that existed, but they didn't exist for his rehabilitation because he was too incorrigible to be able to benefit from them. But that's not the case here. And since this is relevant to all of these factors, it should be considered. I'm not so sure I agree with you that that they would work against him, because I think if you're looking backwards at the time when an individual is a juvenile, he would not have had that much time to be either rehabilitated or not rehabilitated. We'd be looking at, we'd be taking a snapshot in time when an individual was not even above the age of 17. And I think the inquiry and the factor, and you can correct me or maybe you can give me a different perspective, I think the factor that queries as to whether or there are facilities that could be available is really intended to focus on whether or not there would be services available to be provided to the individual, as opposed to whether the individual could be rehabilitated. Because I think we don't find the word rehabilitation included among those factors, do we? We do. I mean, the factor, I believe, is whether there are more facilities, juvenile facilities or facilities with the Department of Juvenile Justice available for defendant's rehabilitation. So yes, we do have that word. And I think part of that is contemplation of whether services existed for this particular defendant. And here we have the benefit of hindsight, even though he was doing some great things as a juvenile and we could have evaluated that factor at the time, we can now look and say, you know, this is somebody that would have benefited from these services. There were no services, particularly, you know, specific services for juveniles in the maximum security prisons that he was incarcerated in. So if he's able to rehabilitate himself in that environment, the existence of rehabilitative services in juvenile facilities, which, you know, by their nature are targeted toward rehabilitating juveniles, would have been easier for him to rehabilitate. He did it in an even more difficult circumstance. So, yeah, I do believe that's something we can consider because, you know, ultimately his question is, is this somebody who could benefit from rehabilitation? And we can also see that he's not a risk to society based on this rehabilitation. Any further questions? I had just one on following up on that point. Isn't the wording of the amendment speaks to facilities particularly available to the juvenile court. So isn't there a requirement, it's not just the generic availability of services, but isn't there a requirement that there be something very particularized and what would it be here? Your Honor, what would be particularized are services, you know, there wasn't any evidence of a particular service, I should say, that was have services available, such as educational programs, you know, perhaps mentorship programs or other programs that are designed particularly for juveniles. So, I mean, I think that's where the particularity comes in is that these any services available through the Department of Juvenile Justice are designed for a juvenile's treatment and rehabilitation where the services in an adult facility aren't. And to be able to actually, you know, apply himself and benefit from those in those circumstances is remarkable and should be considered. Well, this defendant, in fact, had a history in the juvenile court, right? So he had those services available to him, at least at an earlier time. Well, Your Honor, I mean, he did have some juvenile history. Those were, you know, eligible for adult sentencing, and I don't believe he was actually sentenced to the Department of Juvenile Justice for those, any of those. So I don't think he was privy to those services. But even if so, those offenses occur when he was under 15, coming from a, you know, pretty rough upbringing. And, you know, I think he's since has shown that he's changed quite a bit. The judge, after the 2022 hearing, even recognized that he had changed his life. Okay, thank you. Anything further? No. Okay, Noah, you may proceed. Thank you. Assistant State's Attorney, Noah Montague, on behalf of the people in this matter. Your Honor, there are two things in this case that are the most pressing and most poignant consideration for this court. The first is simply a reminder of the facts of this case, because the state does not agree with the defense analysis of those facts. The facts in this case, the facts that were brought out before trial, the facts that were brought out, I mean, in trial and submitted to the jury, show that this defendant was sitting inside a house of one of his friends playing video games, that he saw the victim walk by outside the house and without provocation of any kind, picked up a gun, ran out of the house, ran up to the victim and shot him in the back. Okay, that is the crime that we are dealing with here. And so, again, the state mentioned this in its brief, but the state wholeheartedly disagrees with any analysis of those facts that show that, in any way, that this crime was not aggressive and premeditated. Because if it was not premeditated, what then was in the defendant's mind when he picked up that gun and ran out of the house and ran up to that defendant? He was not thinking about, you know, giving him a bouquet of roses. He was thinking about murdering the victim. That is clear from the evidence, and that is premeditation. The second thing to recall here in this case, though, that is of the utmost importance, is that this court is being asked to review the trial court's discretionary application of two different statutes to this defendant. One, Section 5-130C2, and the other, the actual just sentencing statute. Now, as to both of these cases, though, to both of those exercises of the court's discretion, this is not de novo review. This is not a case where this court is being asked to sit, look at all the evidence, look at all the factors, and say, well, what would we do in this case? Illinois law is actually not allowing this court to do that here. Illinois law says that this court, in reviewing for an abuse of discretion, only looks at what is in the record, what the court did, and determine whether or not it is completely irrational. There is no sign in this record that the court's decision to grant the state's motion to sentence this defendant as an adult was in any way irrational, arbitrary, or based on fanciful thinking or anything of the like. And you can see this quite clearly from the discussion that the state had of the factors in its brief. But it's also really important to see that that statute, C2, the subsection C2, one, that statute was adopted in 1998 and has not been amended since then. So, we're not dealing with some sort of post-Miller versus Alabama new statute. We're dealing with the same statute from 1998 on C2. And secondly, that statute mandates only two things. It mandates that the court conduct a hearing and that the court consider those six factors. So, anything else beyond that is not mandated by the statute. And so, for an argument to say that, well, the court should have done this and that outside of what the statute is asking for and mandating for the trial court to do, that is an argument that is best made to the legislature as a matter of policy to ask the legislature to change the statute. But the trial court sitting in its trial court status in this was required by Illinois law to follow that statute. And that statute says you hold a hearing and you consider those six factors. And when the court did, as the state has already said, it was clearly unquestionably an aggressive and premeditated crime. There is no rational explanation of why someone would grab a gun, run outside a house without provocation, run up to someone and if it wasn't in their mind to shoot them from the second they grabbed that gun, why on earth would that person grab the gun and run out to that victim if it was not in their mind and thus premeditated? The second one, the prior history, this court has already noted that the defendant, he was only 15, of course, but he did have a prior history. And well, that's what the statute asks. And then the security of the public, the state argued this in his brief and the state also pointed out that, well, the defendant's record in prison isn't all rehabilitation. It isn't all positive. He has also had negative marks on his record. And more importantly, when you look at F and E, you're talking about someone who murdered another teenager without any provocation whatsoever, just summarily executed another human being for no reason. That is clear evidence that the security of the public is at risk from this person and that he obviously used a deadly weapon. Now, as far as discharge goes, the defendant has repeatedly made arguments about discharge. That isn't one of the factors. This situation more than likely was not considered by the legislature when it wrote 5-130C2. It was, as this court pointed out, more than likely written only considering whether or not a defendant who is currently a juvenile should be sentenced as an adult or under the Juvenile Court Act. So the cases that came along later and said, I'm totally planking on what the case is called now, but that a person over 21 who is subject to juvenile sentencing can't be sentenced under the Juvenile Court Act because the Juvenile Court Act limits it. It says you can only be sentenced under that act when you are a certain age. That case hadn't been decided in 1998. And more importantly, the actual factors that the court is mandated to consider, A through F, do not talk about discharge and they do not talk about what rehabilitation the defendant has done in prison. So for those reasons, the state would ask that this court recall that this is an abuse of discretion case. And this court on this record did not abuse its discretion in any way, shape, or form. And the defense arguments that are being made here are arguments as to matters of policy that go to legislation, not courts. And secondly, only briefly on the excessive sentence, the state would just point out that, one, a sentence within the statutory range, which 25 is clearly between 20 and 60, is presumptively proper. There is nothing in this record to overcome that presumption. And the state would also point out the, frankly, absurdity of arguing that five years above the minimum is somehow an abuse of discretion on the matter of the court when that teenage boy that this defendant murdered gets zero years of the rest of his life. The severity of the crime is the most important factor in sentencing under Illinois law. And the severity of the crime here fully justified a sentence of five years above the minimum. Well, for those reasons, the state would ask you to affirm the circuit court's ruling on the state's and sentence. Any questions? So just quickly then, just because rehabilitation seems to be really a hot button issue for the defense and whether or not the court, understanding that this is an abuse of discretion standard, we're clear about that. But what would you argue in response to the appellant who insist rather strongly that all of the rehabilitative conduct that's been evidenced and acknowledged by the trial court, by the way, what would you suggest should be this court's posture or how should we respond to that? Well, in responding to it, under the two different issues, I think would be, under the first issue, it would simply be, look, this court is reviewing a decision made under the statute and the statute mandates two things. And none of those things that the statute mandates are to consider what has the defendant done in prison since his original sentence. That is simply not a factor that is within the statute. And if it is to be considered, it would only be possible to be considered if the legislature changed the law to mandate that it be so. There's simply no logical way to just say, well, under Illinois law, which obviously this court's going to be very familiar with laws of statutory interpretation that say that you can't read exceptions and conditions into a law that are not there. That's fully applicable here. So while those considerations may be best presented to the legislature, they have no basis for finding of abusive discretion with the law as it is. Because, again, the court was acting purely by mandate of the statute and fulfilled that mandate. As to the actual sentencing, again, the excessive sentence consideration, in that case, it really is just a matter of did the court sentence the defendant within the range? And if the court did so, is there any sign that the court did something out of the spirit of the law? And there's no question that there is nothing in this record to support that. Anything further? I have nothing. Okay, Byron, you may go forward. Thank you, Your Honor. Your Honor, the state mentioned the facts of the case in premeditation, mentioned the facts of the case generally, but failed to identify still any actual evidence of premeditation. Just speculates about what Kevin was thinking. And look, this isn't, you know, I'm not relitigating. You know, there was a guilty verdict in this case, I understand. But one thing this court can look at is the evidence that was presented at trial. And there were four occurrence witnesses. Three of them didn't see the shooting, never identified Kevin as the shooter, and never saw him with a gun. The one witness who identified Kevin as a shooter prior to trial recanted his identification testimony. There's also an actual innocence evidentiary hearing in this case where several other witnesses identified somebody else as the actual shooter. So that is evidence that can be considered in determining how much weight to give certain factors, such as, you know, the aggressive manner of the offense and the use of a gun. It can be balanced against the evidence that most of the witnesses, if not all, never saw Kevin with a gun and didn't identify him as the shooter. As far as abusive discretion, that is the standard. The state seems to suggest that as long as the court considers the factors, it's not abused its discretion. But the thing is, the court here said multiple times that several of these factors didn't even apply here, including the rehabilitative factor and the defendant's age. The court wasn't even sure if they applied. The court itself expressed confusion repeatedly on the record, which, you know, undermines its own ability to exercise its discretion. It didn't know exactly what to do here. The state, you know, the state doesn't want the court to consider all of this evidence of rehabilitation, but it still cites nothing, no case law, no statute that precludes considering this in this context. It just doesn't like this evidence. And that shouldn't be enough because it doesn't even right now dispute the relevance of the evidence. This is, you know, obviously relevant evidence and should be considered to make the most reliable determination of which sentencing avenue is appropriate. Here, the judge did abuse its discretion. It abused its discretion by failing to consider that evidence and failing to apply properly all of the factors. For that reason, your honor, we ask that you reverse the court's decision and remand with instructions to discharge Kevin or reduce his sentence to 20 years. Any questions? I have none. Thank you, Justice. All right. Thank you both. You both made a very well-prepared presentation and very pointed as to the two basic issues in this case. Me having been on buffer, I sympathize, but I understand all of what's going on here. So we'll see what the outcome is. Thank you.